AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Hawaii

ORIGINAL

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

FEB 27 2019

at 3 o'clock and 13 min. P M
SUE BEITIA, CLERK

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

iPhone 7 Plus, Model A1784
bearing IMEI number 355353087436097

)
)
)
)
)
)

Case No.

MJ-19-00198 RLP

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Attachment A, as fully incorporated herein.

located in the _____ District of _____ Hawaii _____ , there is now concealed *(identify the person or describe the property to be seized)*:

Attachment B, as fully incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18 USC Secs 4, 1347 922(g)(3), 924(a)(2) Title 21 USC 841(a)(1), 846 | Misprision of a Felony; Addict in Possession of a Firearm; Health Care Fraud; Distribution and Dispensing of Controlled Substances and Conspiracy. |

The application is based on these facts:

See attached affidavit of FBI Special Agent Nicole Vallieres, as incorporated fully herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Nicole Vallieres, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 27 February 2019

_____
*Judge's signature*

City and state:  Honolulu, Hawaii

Hon. Richard L. Puglisi, U.S. Magistrate Judge
*Printed name and title*

## UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>iPhone 7 Plus, Model A1784, bearing IMEI number 355353087436097 | Case No. _____ |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Nicole Vallieres, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since July 2014. I am responsible for investigating civil rights and public corruption matters within the District of Hawaii. I have received specialized training pertaining to these and other areas of federal law. I have also worked and consulted with many law enforcement officers experienced in these types of investigations.

2.     I make this affidavit in support of an application for a search warrant for the following cellular telephone ("**Target Telephone**"), as more particularly described in Attachment A, incorporated herein: iPhone 7 Plus, Model A1784, bearing IMEI number 355353087436097.   The **Target Telephone** was seized from Rudolph B. PUANA ("PUANA") on February 12, 2019, incident to his arrest. This application seeks

1

permission to seize items from the **Target Telephone**, as more particularly described in Attachment B, incorporated herein.

3.     On February 8, 2019, United States Magistrate Judge Richard L. Puglisi issued a warrant, at the grand jury's request, for PUANA's arrest based on a criminal indictment (CR 19-00015-JMS-RLP) charging PUANA and his sister, Katherine P. KEALOHA ("KEALOHA") with violations of federal law. Specifically, PUANA and KEALOHA are charged with a violation of Title 21, United States Code, Sections 846 (Conspiracy to Distribute Controlled Substances). PUANA is further charged with violations of Title 21, United States Code, Section 841(a)(1) (Distributing and Dispensing Oxycodone and Fentanyl); Title 18, United States Code, Section 1347 (Health Care Fraud); and Title 18, United States Code, Sections 922(g)(3) and 924(a)(2) (Addict in Possession of a Firearm).  KEALOHA is additionally charged with a violation of Title 18, United States Code, Section 4 (Misprision of Felony).  These offenses are collectively referred to as the "Target Offenses."

4.     Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, I believe the items to be seized set forth in Attachment B will be found in the **Target Telephone**, as described above and in Attachment A. These items may be or lead to: (1) evidence of the existence of the Target Offenses; and (2) property designed or intended for use, or which is or has been used as a means of committing criminal offenses, specifically the Target Offenses.

//

2

5.     The facts in this affidavit are derived from my personal observations, my training and experience, and information obtained from other agents and witnesses. Because this affidavit is submitted for the limited purpose of establishing probable cause for the requested warrant, it does not set forth all of my knowledge about this matter. All dates and times cited herein are approximations and are listed in Hawaii Standard Time.

## PROBABLE CAUSE

### A.    PUANA'S ARREST

6.     On February 12, 2019, FBI agents arrived at PUANA's residence to execute the federal warrant issued for his arrest. At approximately 7:28 a.m., as PUANA was exiting his residence, FBI agents encountered PUANA, identified themselves, and arrested PUANA. Agents conducted a search of PUANA's person incident to arrest. During the search, agents located the **Target Telephone** in PUANA's shorts pocket. At that time, PUANA asked if he should keep the **Target Telephone** with him. When agents asked PUANA if he had important telephone numbers from his phone memorized, PUANA stated no. PUANA then chose to keep the **Target Telephone** with him in his pocket. Upon booking PUANA into the Federal Detention Facility, agents seized the **Target Telephone** from PUANA. During the routine booking process, PUANA informed agents that his telephone number was 808-xxx-7577.

### B.    BACKGROUND

7.     PUANA is a doctor licensed to practice medicine in the State of Hawaii and the former co-owner and operator of Puana Pain Clinic located on the Island of Hawaii.

Since approximately 2015, PUANA used his pain clinic as a means to unlawfully distribute and dispense thousands of medically unnecessary amounts of controlled substances, including oxycodone, Xanax, and fentanyl, to various patients – his co-conspirators – at the clinic. Over the course of the conspiracy, PUANA illegally dispensed these prescription pills to his co-conspirators and then coached them on how to resell the prescription drugs for profit or barter the prescriptions for other drugs, such as cocaine, which PUANA and some of the co-conspirators would then use together. KEALOHA was also prescribed pills by PUANA, and participated in recreational cocaine use with PUANA and the co-conspirators. KEALOHA – a Deputy Prosecuting Attorney at the time – also participated in the conspiracy by diverting a drug investigation that would have exposed PUANA in order to prevent PUANA and other co-conspirators from being prosecuted. PUANA – who was also an avid firearm enthusiast – eventually admitted himself to rehabilitation for his drug addiction in 2018. As explained further below, investigators believe PUANA used the **Target Telephone** in furtherance of the Target Offenses.

C.    THE DRUG CONSPIRACY

8.    Sometime around 2014, PUANA reconnected with a childhood friend, C.M., and the two began regularly using cocaine and other controlled substances. According to C.M., he and PUANA had a line-up of medications: testosterone made them feel big, cocaine gave them a high, and opioids and xanax helped them remain calm. C.M. was introduced to cocaine while on the Island of Hawaii at the house of PUANA's friend,

4

J.D.R.  When they would meet on the Island of Hawaii, PUANA would purchase cocaine for his and C.M's consumption by getting his medical staff to purchase it for him.  When PUANA would come to Oahu, C.M. would be responsible for finding and purchasing the cocaine.

9.    Initially, C.M. would pay for the cocaine with his money.  But, as consumption levels increased, PUANA agreed to subsidize the cost by writing medically unnecessary prescriptions of opioids for C.M.  PUANA would write C.M. prescriptions for the powerful opioid oxycodone, and would tell C.M. he could use the drugs himself or sell them to fund the cocaine purchases.  According to C.M., PUANA asked his staff to locate a pharmacy that would fill the prescription, and C.M. was directed to an obscure pharmacy in Oahu for the likely purpose of minimizing attention that larger pharmacies might give to large prescriptions for opioids.  The oxycodone was recreational for C.M. and, in addition to using them, he would feed his cocaine habit by trading and selling the oxycodone pills.  C.M. paid approximately $90 for 120 oxycodone pills, which he would then sell for $15 per pill.  Pharmacy records confirm that between 2015 and 2017, PUANA dispensed at least 2,950 oxycodone pills to C.M.  In addition, an "off-the-record" prescription notebook in PUANA's handwriting recovered from the Puana Pain Clinic reflects he gave C.M. at least another 750 oxycodone pills.

10.   During the spring of 2015, C.M. began spending time with a woman named T.M.  C.M. met T.M. through a friend and she quickly became his source of cocaine.  In addition to selling cocaine to C.M., T.M. would also use cocaine with him.  C.M. later

learned that T.M. could sell other drugs in addition to cocaine. C.M. told PUANA about T.M. and her capacities, and, eventually, introduced PUANA to her at one of her residences in Oahu.

11.    When travelling from the Island of Hawaii to Oahu, PUANA often brought controlled substances taken from the Puana Pain Clinic he owned. According to C.M., upon his arrival in Honolulu, PUANA would often open his checked bag and pull out bottles of controlled substances. On one occasion, PUANA brought eight bottles of Xanax, each bottle containing fifty pills, and asked C.M. to sell or trade the drugs with T.M. On another occasion, PUANA brought C.M. expired fentanyl transdermal patches to sell or barter with T.M. As T.M. was not familiar with fentanyl patches, she said she needed time to figure out how they worked and how they could be sold. In the meantime, she agreed to keep the patches at her residence that she shared with an HPD Officer, A.A.

12.    In late July or early August 2015, C.M. was summoned by PUANA to a Honolulu apartment PUANA had recently rented. Upon arrival, C.M. discovered KEALOHA and an HPD Detective were already with PUANA in the apartment. KEALOHA and the Detective told PUANA and C.M. they were investigating A.A. and T.M., and that PUANA and C.M. needed to provide information about the couple's drug dealing. Shortly after this meeting, PUANA and C.M. went with a friend on an international trip, during which time he learned of T.M.'s arrest. C.M. had no further involvement in the investigation of T.M. and A.A., and was never approached by HPD about his extensive drug use with PUANA, which continued until 2018.

13.     Along with C.M, J.D.R. was also a co-conspirator and sub-distributor for PUANA. J.D.R. and his wife had been treated at PUANA's pain clinics. PUANA and J.D.R. were friends who occasionally used cocaine together. They last used cocaine together in or around July 2018, just before PUANA went to the Betty Ford Clinic to treat his opioid addiction.

14.     According to J.D.R., he began seeing PUANA for old baseball/softball related shoulder pain. PUANA wrote him a monthly prescription for Hydrocodone, which he used to treat his pain. Later, however, PUANA began prescribing J.D.R.'s wife Oxycodone pills on a monthly basis. J.D.R. and his wife did not have a medical need for the Oxycodone pills. Instead, they re-sold the pills in an effort to help pay's their children's private school tuition. In total, they received about 150 pills per month, which, at $20 per pill, yielded $3,000 for their children's school tuition. J.D.R. and his wife used the cash from these sales to pay their children's tuition from about 2014 to 2015.

15.     In November 2018, PUANA – who had recently returned to Hawaii after just one month at the Betty Ford Clinic – agreed to speak with the FBI and prosecutors with his attorney present. During that interview, PUANA acknowledged being addicted to opioids, cocaine, and alcohol, and admitted that he diverted controlled substances for his own personal use. However, he denied knowing that his patients (e.g., C.M. and J.D.R.) were selling or abusing the prescriptions he gave to them. He claimed to have given excessive amounts of oxycodone to C.M. because C.M. could not afford the co-payment. At one point he claimed he gave C.M. fentanyl patches because of C.M.'s back injury –

and then moved him to oxycodone because he needed something stronger – but later in the interview maintained that he gave C.M. the fentanyl to help wean him off oxycodone. PUANA claimed to finish weaning C.M. off his prescriptions around the end of 2017. PUANA admitted that Xanax, oxycodone, and fentanyl found at T.M.'s house during the execution of a search warrant in 2015 came from PUANA's supply at the clinic, and that he gave KEALOHA oxycodone without a prescription. He also admitted that the handwriting in the "off the books" Notebook was his, but claimed that it was his record of treatment for patients he did not want to charge or run through the established record-keeping system at the clinic.

16.     During the November 2018 interview, when asked about his cellphone and use of various messaging applications, PUANA stated he had the WhatsApp and Signal applications on his phone. PUANA then stated that he got a new cellphone about six to 12 months prior and, at the time of the interview, he did not have Signal installed on his phone.

17.     During the course of this investigation, C.M. gave consent to the FBI to complete a forensic analysis of his cellphone. A search of C.M.'s cellphone revealed numerous group text messages and WhatsApp conversations between PUANA, C.M., and others. Some of the conversations with PUANA included conversations about prescription pills. For example, on the night of April 2, 2016, and continuing to the early

morning hours of April 3, 2016, PUANA, using telephone number 808-xxx-1921,

engaged in the following group text conversation with C.M. and J.D.[1]:

| | |
|---|---|
| J.D.: | [C.M.] now has the wizard power too hhaa |
| C.M.: | I will be casting spells like a motherfucker soon. Thanks man! |
| PUANA: | Lol |
| J.D.: | Hahaha, make sure and take in the morning, otherwise you'll be up all night |
| PUANA: | Please don't bother me I'm in the middle of solving zeno's calculus paradox |
| J.D.: | Which level is that on clash royale? |
| C.M.: | Lol |
| J.D.: | Oh and [C.M.], it's modafinil (provigil) |
| J.D.: | I want a cut of the royalties from the brilliant novel you conjure up |
| C.M.: | Hahaha. Sounds good man. Thanks again. I will channel this sorcery and conjure another book tomorrow. |
| PUANA: | FYI. Wizard pills mix well with things. Holy crap [J.D.]'s generosity plus my advanced knowledge in Pharmacology has just made another breakthrough |
| J.D.: | Uh oh…. |
| PUANA: | Fuck!!!! Studying turned into partying. |
| J.D.: | Still going strong? |
| PUANA: | I think it's wearing off |

18.    More recently, on July 12, 2018, PUANA, using telephone number 808-xxx-7577, engaged in the following group WhatsApp conversation with J.D. and C.M.:

| | |
|---|---|
| J.D.: | pow wow tonite? |
| PUANA: | I think we should. [C.M.]? |
| C.M.: | If so, I may need to run to the spinach store. What time are you guys thinking? |
| PUANA: | 730-8 |
| J.D.: | im good anytime before 10 |

---

[1]    J.D. is a former Deputy Prosecuting Attorney for the City and County of Honolulu. C.M. informed investigators that J.D. was also PUANA's divorce attorney and business partner. According to C.M., PUANA met J.D. through KEALOHA. C.M. informed agents that while J.D. did not use cocaine, he talked about using marijuana and prescription pills.

C.M.:          Works for me.

19.     During an interview with the FBI on December 12, 2018, C.M. informed agents that "wizard pills" referred to prescription Adderall.  C.M. stated that "wizardry" was a term he, PUANA, and J.D. made up to refer to a state of being, possibly while on wizard pills.  C.M. never saw PUANA on wizard pills and was not aware of what types of pills PUANA took.  When asked about the meaning of "spinach store," C.M. stated it referred to getting cocaine.

20.     Based on the above facts and conversations between PUANA and co-conspirators through text messages and WhatsApp, I believe PUANA used his cellular device in furtherance of the drug distribution conspiracy.  And, although PUANA claimed he got a new cellphone about six to 12 months prior to his meeting with the FBI – which would be sometime between November 2017 and May 2018 – and the text messages and WhatsApp conversations reveal that PUANA in fact had two phone numbers since 2016, I believe evidence of the drug distribution conspiracy will be found on the **Target Telephone**.  C.M. and J.D.R. both stated they did cocaine with PUANA as recently as 2018, which is supported by the WhatsApp conversation above.  Moreover, according to PUANA, he claimed to finish weaning C.M. off his prescriptions around the end of 2017.  Finally, based on the phone number PUANA gave to agents during the booking process, it appears the **Target Telephone** bears the same number as the phone number PUANA used in the WhatsApp conversation above in July 2018.  Therefore, I believe evidence of the drug distribution conspiracy will be found on the **Target Telephone.**

### D.   ADDICT IN POSSESSION OF FIREARMS

21.   During the course of the drug conspiracy, which included PUANA's eventual admission to a drug rehabilitation facility (the Betty Ford Clinic) in the summer of 2018, PUANA also possessed various firearms.   He used his mobile phone to communicate with others to boast about firearms and coordinate the delivery and/or transfer of his firearms while he was in rehab.  For example, on June 24, 2018, PUANA, using telephone number 808-xxx-7577, and C.M. engaged in the following text conversation over WhatsApp:

| | |
|---|---|
| CM: | True. I am like Shaq. I just finished handgun certification. It was like being in the line at DMV. It made my opinion on the Second Amendment even more grey.<br>[] |
| PUANA: | Lol. It should solidify it up. If those fucking idiots got guns. Ummmm shouldn't you. My opinion is to have more than them. Now. The next time you come let's shoot all my guns. And let me say i have a lot and i only have fucking erection quality ones |
| CM: | Yea, I've seen a couple of them. As to your first point, that's valid. Plus that chick is going to end up shooting herself in the face. Thin the herd.<br>[] |
| PUANA: | Seeing them and appreciating them by shooting them is totally different. My guns are always something cool. It's why i guy an individual gun. Each one is like a Role. If you put one on you want one. Maybe next week or the week after that i fly down and look at watches. Shocking big island don't have any. There are like three models I'm looking at. It's hard to pop fir the platinum but i like how it looks. However there are two others that might be even nicer that are not platinum. I need to see it personally |
| C.M.: | Any time. Just Ala Moana has like three stores that sell Rolexes. As for the guns, sounds like fun to me. For my personal use, I'm just leaning towards like a $500 Glock or a HK. Talked to Andy. He gets first responder discount. He can buy then I'll just buy from him. |
| PUANA: | Yea he's a gun instructor and you are belly up to the bar [C.M.]. What gun you thinking of. I think you'd fit a glock 9mm. I don't like the |

|          | small caliber usually but it's so smooth. The new Ruger 40,44,45 caliber is bad ass. My favorite gun to date is the glock 357sig. Rare gun and wish i never sold it years ago. Maybe we look at guns too all in one trip. Hmmmmmm maybe i should fly up? |
| -------- | ------- |
| PUANA:   | Hks are bad ass too. We just need to go look |
| PUANA:   | I think I'd be an asset looking with you |
| C.M.:    | Fucking Rolex and gun shopping lol. No part of that sounds bad. |
| C.M.:    | You no doubt would be. |
|          | [] |
| C.M.:    | Yea, right now thinking 9mm. I don't wanna go to the range and get tired hands after like 40 rounds. |
| PUANA:   | Absolutely. However just the caliber doesnt say that. Take my lapua [a long rifle] i cAn put out 1000 rounds through that and you wouldn't get tired. My 454/44 rhino chaser or 44 mag. To shots you'd be tired. However the 45 caliber glock with muzzle suppression retro recoil technology you could fire 200 rounds compared to my 357 in which you'd pass the gun at shot 6. It's all about the gun not the caliber. I have a 25 cal derringer that hurts more than my 45 |

22.    Within approximately six weeks of the above exchange, PUANA was admitted to the Betty Ford Clinic. While in rehab, around September 2018, PUANA telephoned a former business partner and asked her to go to a specific drawer in a treatment room at PUANA's pain clinic, retrieve his "Glock," and deliver it to PUANA's home address. The former business partner retrieved the Glock and delivered it as requested. Shortly thereafter, the former business partner got a second call from PUANA informing her that she had forgotten the clip and directing her to it; she then found it and delivered it as requested.

23.    After being released from the drug treatment facility, on October 19, 2018, PUANA went to a licensed gun dealer in Waimea. There, PUANA told a store customer he was there to sell some guns and offered him first choice. The customer bought a Thompson Center Arms, 7mmVenture, long rifle. Thereafter, PUANA sold the licensed

gun dealer six guns. PUANA also tried to sell two additional firearms but did not have paperwork for them. The gun dealer did not accept them and he left the store with them.

24.     Based on the above facts, I believe PUANA utilized the **Target Telephone** in furtherance of possessing firearms while being an addict.

<u>TECHNICAL TERMS: CELLULAR TELEPHONES,</u>
<u>ELECTRONIC STORAGE, AND FORENSIC ANALYSIS</u>

25.     As described above and in Attachment B, this application seeks permission to search for records that might be found in the **Target Telephone**, in whatever form they are found. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

26.     *Probable cause.*  I submit that on the **Target Telephone** there is probable cause to believe those records will be stored for at least the following reasons:

> a. Based on my knowledge, training and experience, I know that subjects who engage in drug distribution and the possession or sale of firearms often keep cellular telephones on their persons, in their vehicles, in their offices, or in their residence, or other readily accessible places, in order to communicate and coordinate with co-conspirators and take photos of contraband and firearms.  As stated above, PUANA has used the **Target Telephone** to communicate with co-conspirators about controlled substances and to discuss his possession of firearms.

13

b. Based on my knowledge, training, and experience, I know that files or remnants of communications can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a cellular telephone, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

c. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a cellular telephone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

d. Wholly apart from user-generated files, electronic storage media—in particular, cellular telephones' internal hard drives—contain electronic evidence of how a cellular telephone has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system

14

configurations; artifacts from operating system or application operation; file system data structures; and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence because special software is typically required for that task. However, it is technically possible to delete this information.

e. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

f. In addition, although communication via the applications "WhatsApp" and "Signal" are encrypted and, for Signal, may be set at a default which forces messages to be deleted from anywhere between every 5 seconds to every week, forensic tools may be used to retrieve the deleted messages, depending on the type of cellular phone. Any messages that are not deleted, and therefore still contained on the Signal application on the cellular phone, may be retrieved through the use of forensic tools. In addition, forensic tools may be used to retrieve the WhatsApp messages through the WhatsApp application on the cellular telephone.

27. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that

establishes how the cellular telephone was used, the purpose of the use, who used it, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium because:

g.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

h.  As explained herein, information stored within a computer, cellular telephones, and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States

16

to establish and prove each element or alternatively, to exclude the innocent from further suspicion.   In my training and experience, information stored within a computer, cellular telephone, or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, Internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  Storage media activity can indicate how and when the storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For

17

example, images stored on a computer or a cellular telephone may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the user. Lastly, information stored within a computer or cellular telephone may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information within the device may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., deleted text messages or running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

i. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling

communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

j.  A person with appropriate familiarity with how a cellular telephone works can, after examining this forensic evidence in its proper context, draw conclusions about how cellular telephones were used, the purpose of their use, who used them, and when.

k.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, evidence

19

from a cellular telephone is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a cellular telephone is evidence may depend on other information stored on the cellular telephone and the application of knowledge about how a cellular telephone behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

l. Further, in finding evidence of how a cellular telephone was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the cellular telephone. For example, the presence or absence of counter-forensic programs may be relevant to establishing the user's intent.

28. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a cellular telephone's contents to human inspection in order to determine whether it is evidence described by the warrant.

29.    *Filter Team.*  I have been informed that the **Target Telephone** may contain records and data (texts, emails, and voicemails) subject to the attorney-client privilege. Because of the potential sensitivity of the records and data on the **Target Telephone**, the search warrant will be executed by a Filter Team composed of an Assistant United States Attorney from the Southern District of California and FBI Special Agents from the Hawaii Division who are not members of the prosecution team.  The Filter Team will search the **Target Telephone** for records and data responsive to Attachment B of this warrant. During the search, the Filter Team will segregate records and data subject to privilege. Any such privileged items will be sealed from the prosecution team.  All items responsive to Attachment B that are not marked as privileged or that fall under an exception to privilege will be made available to the prosecution team.

CONCLUSION

30.    I submit that this affidavit supports probable cause for a warrant to search the **Target Telephone** described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

Nicole Vallieres, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on           27       , 2019.

RICHARD L. PUGLISI
United States Magistrate Judge OF HAWAII

21

ATTACHMENT A

Property To Be Searched

The property to be searched in connection with an investigation of violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Sections 4, 922(g)(3), 924(a)(2), and 1347, is described below:

iPhone 7 Plus, Model A1784, bearing IMEI number 355353087436097
**(Target Telephone)**

Currently in the possession of the Federal Bureau of Investigation in Honolulu, Hawaii.

## ATTACHMENT B

### Items To Be Seized

Authorization to search the **Target Telephone** described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Telephone**. The seizure and search of the **Target Telephone** will be conducted in accordance with the affidavit submitted in support of the warrant, which is incorporated herein.

The evidence to be seized from the **Target Telephone** will be electronic records, communications, and data, such as emails, text messages, photographs, audio files, videos, and location data, for the period of January 1, 2014, through February 12, 2019, evidencing violations of Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Sections 4, 922(g)(3), 924(a)(2), and 1347:

   a.   evidence tending to identify the distribution or dispensing of controlled substances, including prescription pills; to defraud a health care benefit program or obtain money and property owned by and under the custody and control of a health care benefit program; to conceal a federal criminal offense; to show drug use and addiction; and to further the possession or transfer of firearms.

   b.   evidence tending to show an agreement to participate in the criminal scheme to distribute or dispense controlled substances, including prescription pills, and conceal a federal criminal offense.

   c.   evidence tending to identify other facilities, storage devices, or services–such as email addresses, IP addresses, phone numbers–that may contain electronic evidence tending to indicate efforts to distribute or dispense controlled substances, including prescription pills; defraud a health care benefit program or obtain money and property owned by and under the custody and control of a health care benefit program; conceal a federal criminal offense; engage in illicit drug use; and further the possession or transfer of firearms;

   d.   evidence tending to identify co-conspirators, criminal associates, or others involved in efforts to distribute or dispense controlled substances, including prescription pills; defraud a health care benefit program or obtain money and property owned by and under the custody and control of a health care benefit program; conceal a federal criminal offense; engage in illicit drug use; and further the possession or transfer of firearms;

   e.   tending to identify the user of, or persons with control over or access to, the **Target Telephone**; and/or

   f.   evidence tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.